_In re_ ESTATE OF FLOYD W. FUNK, Deceased (The United States of America, Secured Creditor, Plaintiff-Appellant, v. Patsy Printy, Ex'x, _et al._, Defendants-Appellees.

Fourth District   No. 4—03—1047

Argued September 23, 2004.—Opinion filed December 23, 2004.—Modified on denial of rehearing February 4, 2005.

STEIGMANN, J., dissenting.

Jan Paul Miller, United States Attorney, of Urbana (David H. Hoff (argued), Assistant United States Attorney, of counsel), for appellant.

David R. Cherry (argued), of Winchester, appellee *pro se*.

No brief filed for appellee Patsy Printy.

JUSTICE APPLETON delivered the opinion of the court:

The United States of America appeals the entry of an order by the trial court, which was entered by the mandate of this court on a prior appeal. We affirm the trial court's interpretation of that mandate.

## I. BACKGROUND

When Floyd Funk died in January 1983, he left a valid will naming his surviving spouse, defendant Patsy Printy, as the executrix of his estate. At the time of his death, Floyd owned a 62-acre farm in Scott County, Illinois, and a three-quarter interest in another farm.

(Floyd's then-12-year-old son, Michael, owned the other one-quarter interest in that farm.) In February 1983, the trial court appointed Patsy as executrix of Floyd's estate.

In July 1983, the Farmers Home Administration of the United States Department of Agriculture (FmHA) filed an amended proof of debt in the probate proceeding, asserting that at the time of Floyd's death, he owed $234,106.86 to plaintiff, the United States of America, which was a secured creditor of Floyd's estate. (Between May 1980 and April 1982, Floyd had borrowed a total of $319,290 from the United States through FmHA. Floyd's FmHA loans were secured by mortgages on the 62-acre farm and Floyd's three-quarter interest in the other farm.)

In March 1998, Patsy, acting as executrix, filed an amended account of her actions as executrix, encompassing the entire period of January 7, 1983 (the date of Floyd's death), to March 2, 1998. Interim current reports had been filed with notice to all parties and approved in 1983, 1984, and 1989. In June 1998, the United States filed an objection to the amended account, in which it alleged that Patsy had violated fiduciary duties she owed to the United States by selling collateral pledged to the United States and distributing the sale proceeds and the interest that had accrued on those proceeds to third parties in violation of state and federal law. At a July 1998 hearing, the trial court determined that the United States' objection presented questions of law only, and the court later entered a written order approving the amended account.

The United States appealed to this court, and we reversed and remanded, concluding that a genuine issue of material fact existed that precluded the trial court from entering judgment on the pleadings. We directed the trial court on remand to conduct a hearing to determine whether the United States had agreed to discharge or subordinate its liens, thereby authorizing Patsy to use the proceeds from the sale of its secured collateral for estate administration expenses. *In re Estate of Funk*, No. 4—98—0640, slip order at 27 (April 14, 1999) (unpublished order under Supreme Court Rule 23) (*Funk I*).

In November 1999, the trial court conducted an evidentiary hearing on that issue, as well as other United States' objections to the amended account, and took the matter under advisement. In February 2000, the court approved the amended account, specifically finding that (1) the United States allowed Patsy to keep the estate open and manage the farm operations following Floyd's January 1983 death; and (2) under the Probate Act of 1975 (Act) (Ill. Rev. Stat. 1981, ch. 110½, par. 18—10; 755 ILCS 5/18—10 (West 2000)), executrix and attorney fees take priority over claims of the United States.

The United States appealed to this court, and we reversed and remanded for further proceedings, upon concluding that the trial court's order approving the amended account was erroneous as a matter of law. *Estate of Funk v. Printy*, No. 4—00—0178, slip order at 13 (October 19, 2000) (unpublished order under Supreme Court Rule 23) (*Funk II*). In so concluding, we stated, in pertinent part, as follows:

"First, the [trial] court appears to equate the United States' agreement to allow Patsy to keep the estate open and operate the farms (from 1983 through 1988) with an agreement to discharge or subordinate its liens on its secured collateral. However, in *[In re Estate of] Yealick*, 69 Ill. App. 3d [353,] 356, 387 N.E.2d [399,] 401 [1979], this court held that a creditor's authorization for or acquiescence in a sale of secured property does not affect the creditor's rights to the sale proceeds as against the debtor. \*\*\* The fact that the United States agreed to allow Patsy to operate the farms for a period of time simply does not affect the United States' rights to the sale proceeds in this case. (As earlier discussed, a secured creditor has a right to gross sale proceeds, subject to customary incidental costs appropriate to the sale of the collateral. See 7 C.F.R. § 1965.13(f)(2) (1998) (setting forth appropriate incidental costs).)

In addition, the trial court erroneously found that under the Act, the attorney fees and execut[rix] fees take priority over the United States' claims here. As discussed above, section 18—10 of the Act deals with the priority of claims of the United States for which it does *not* have liens. See 755 ILCS 5/18—10 (West 1996); *Furness [v. Union National Bank of Chicago]*, 147 Ill. [570,] 573-74, 35 N.E. [624,] 625 [(1893)]; *[In re Estate of] Philp*, 114 Ill. App. 3d [107,] 111, 448 N.E.2d [535,] 537 [(1983)]; *Yealick*, 69 Ill. App. 3d at 355-56, 387 N.E.2d at 400-01. Thus, under that section, estate administration expenses take priority over claims of the United States only if the United States' liens have been discharged, which they have not been in this case. Regardless of the reasonableness of the fees in this case, they do not set aside the United States' valid liens. See *King [v. Goodwin]*, 130 Ill. [102,] 109-10, 22 N.E. [533,] 535 [(1889)]. The court's finding to the contrary was erroneous as a matter of law." (Emphasis in original.) *Funk II*, slip order at 11-13.

In December 2001, David Cherry moved to withdraw as Patsy's attorney. Following a mid March 2001 hearing, the trial court (1) allowed Cherry to withdraw and ordered that he remain in the case as an interested party; (2) continued the case for 21 days to allow Patsy an opportunity to obtain new counsel; and (3) ordered the United States to file, within 30 days following the above mentioned 21-day period, a final account of Patsy's actions as executrix.

In April 2001, the United States filed a final account, which provided, in pertinent part, that (1) Patsy had wrongfully sold collateral pledged to the United States and distributed $89,666.49 in sale proceeds and accrued interest to third parties, including Cherry, in violation of state and federal law and without the United States' consent; and (2) Cherry wrongfully received $38,830.73 in attorney fees from those sale proceeds and accrued interest. The proposed report also requested that the court (1) enter a judgment against Patsy "in the amount of $89,666.49 [minus] $38,830.73 (amount attorney Cherry is ordered to repay [the] United States)"; (2) order Cherry to return $38,830.73 to the United States; (3) resolve the United States' two pending petitions seeking an assessment of penalty interest against Patsy; and (4) close Floyd's estate after resolving the pending matters. Neither Patsy nor Cherry filed a response or an objection to the United States' proposed final account.

In late August 2001, the trial court adopted the United States' final account and directed the United States to prepare an order approving that account. The court also advised the parties that it would enter the proposed order if Patsy or Cherry did not file objections within 10 days of receiving the proposed order. In early September 2001, the United States filed the proposed order. The United States also sent copies of the proposed order to both Patsy and Cherry; however, neither Patsy nor Cherry filed an objection.

Later in September 2001, the trial court entered a written order approving the final account and adopting the report and its attached exhibits as the court's factual findings. The order provided, in pertinent part, as follows:

"8. [Patsy] and [Cherry] have had more than four months to review the United States' proposed final report, and in open court on August 31, 2001, neither [Patsy] nor [Cherry] objected to the factual allegations set forth in that proposed [account]. Also, a copy of this proposed order prepared by the United States was sent to [Patsy] and [Cherry] by the United States on September 4, 2001, and no objections to the entry of this order have been submitted to the [c]ourt.

9. Consequently, the United States' proposed final [account] and attached exhibits are adopted by this [c]ourt and incorporated herein as the substantive factual findings of this [c]ourt. Based upon those factual findings, [Patsy's] distributions of $89,666.49 of the United States' secured collateral and accrued interest thereon detail[ed] in that proposed [account] are not allowed.

* * *

1. [Patsy's] distributions of $89,666.49 of the United States'

secured collateral and accrued interest thereon *** were made by [Patsy] (1) in violation of her fiduciary duties owed as execut[rix] to the United States as a secured creditor of the estate; (2) contrary to law; (3) without prior court approval; and (4) without the consent of the United States. Consequently, those distributions totaling $89,666.49 are disallowed and not approved by this [c]ourt.

2. The $38,830.73 of attorney's fees paid by [Patsy] to [Cherry] with the secured moneys of the United States and accrued interest thereon are disallowed because (1) secured moneys cannot be used to pay expenses of administration or any other expenses without the consent of the secured creditor; (2) the execut[rix] paid these fees with the secured moneys of the United States without prior court approval; and (3) the United States as secured creditor did not consent to its secured collateral being distributed by the execut[rix] to her attorney, [Cherry], in payment of his attorney's fees."

The court's order also provided that (1) Patsy was "not yet discharged" as executrix of Floyd's estate; and (2) the court would schedule further hearings on the following pending matters: (a) the United States' petition for entry of a monetary judgment against Patsy, (b) the United States' request that the court order Cherry to return $38,830.73 to the United States, and (c) the United States' two petitions, which sought an assessment of penalty interest against Patsy.

That same day, the trial court directed the circuit clerk to enter the following docket entry: "Final [r]eport of the [e]xecut[rix] entered this date. Estate closed. Cause stricken." The clerk entered that docket entry two days later on September 21, 2001.

The United States appealed to this court, arguing that the docket entry closing Floyd's estate and striking the cause should be vacated because it was "fatally inconsistent" with the trial court's September 2001 written order approving the final account. The United States also requested, in pertinent part, that in lieu of remanding the case for further proceedings, this court enter (1) an order directing Cherry to return to the United States $38,830.73 in disallowed attorney fees and (2) an $89,666.49 judgment against Patsy, to be offset by a credit totaling whatever amount Cherry might actually repay the United States. Cherry conceded that the docket entry should be vacated, but he did not challenge the court's September 2001 written order approving the final account. We accepted Cherry's concession and vacated the docket entry. However, we declined the United States' request that we enter judgment under Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366(a)(5)), noting that the trial court had not ruled upon the issues and the parties had not had an opportunity to present all of their evidence on those issues. We thus remanded for further proceedings

on the United States' pending petitions. *In re Estate of Funk*, No. 4—01—0902 (June 11, 2002) (unpublished order under Supreme Court Rule 23) (*Funk III*).

In September 2002, the United States filed a summary judgment motion, requesting that the trial court order Cherry to repay to the United States $38,830.73 in attorney fees that the court had previously disallowed. In December 2002, Cherry filed a response, arguing that the United States' motion was premature because a genuine issue of material fact existed as to whether the attorney fees were "unreasonable, excessive[,] or unearned." Later in December 2003, the United States filed a reply, arguing that no genuine issue of material fact existed that precluded summary judgment in its favor.

During a February 2003 hearing on the United States' summary judgment motion, the United States requested that the trial court (1) order Cherry to repay the $38,830.73 in disallowed attorney fees to the United States and (2) offset the monetary judgment against Patsy with a credit totaling $38,830.73. Alternatively, the United States requested that the court order (1) Cherry to refund the $38,830.73 to Patsy as executrix and (2) Patsy to turn over the $38,830.73 to the United States. In March 2003, the court issued a docket entry order denying the United States' summary judgment motion. The United States appealed the trial court's order denying its motion, and this court dismissed the appeal, upon concluding that the docket entry order was not a final order for purposes of appeal. *In re Estate of Funk*, No. 4—03—0235 (September 5, 2003) (unpublished order under Supreme Court Rule 23) (*Funk IV*).

Later in September 2003, the United States filed motions (1) requesting that the trial court enter a final appealable order and (2) to dismiss its petitions seeking an assessment of penalty interest against Patsy. At the October 2003 hearing on those motions, the United States stipulated that Cherry's attorney fees were reasonable and earned by him. The trial court entered a December 2003 written order (1) granting a $90,092.66 judgment against Patsy, (2) denying the United States' summary judgment motion, (3) granting the United States' motion to dismiss its pending petitions seeking an assessment of penalty interest against Patsy, and (4) closing the estate. It declined to order Cherry to refund the $38,830.73 in fees paid to him by the executor.

This appeal followed.

Although Patsy did not file a brief with this court, we are thoroughly familiar with this case, and the claimed error is such that we can decide this appeal on the merits without the aid of Patsy's appellee brief. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976).

## II. THE TRIAL COURT'S DENIAL OF THE UNITED STATES' SUMMARY JUDGMENT MOTION

The United States argues that the trial court erred by denying its summary judgment motion. Specifically, the United States contends that the court should have ordered Cherry to repay $38,830.73 in previously disallowed attorney fees directly to the United States, as the secured creditor of Floyd's estate. Alternatively, the United States contends that the court should have ordered Cherry to return the disallowed attorney fees to Patsy, as the executrix of Floyd's estate.

### A. Summary Judgments and the Standard of Review

■ Summary judgment is proper "where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 333, 662 N.E.2d 397, 402 (1996); see 735 ILCS 5/2—1005(c) (West 2002). We review *de novo* the trial court's grant of summary judgment. *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466, 470-71, 758 N.E.2d 848, 851 (2001).

### B. The Trial Court's Determination That the Attorney Fees Were Disallowed

Initially, we agree with the United States that Cherry cannot challenge on appeal the trial court's determination that the $38,830.73 in attorney fees were disallowed.

■ Section 24—2 of the Act provides, in pertinent part, as follows:
"Notice of the hearing on any account of a representative of a decedent's estate shall be given as the court directs to unpaid creditors and to all other interested persons. If the account is approved by the court upon the hearing, in the absence of fraud, accident[,] or mistake, the account as approved is binding upon all persons to whom the notice was given." 755 ILCS 5/24—2 (West 2002).

See *In re Estate of Aschauer*, 188 Ill. App. 3d 63, 68, 544 N.E.2d 71, 75 (1989) (the approval of an account by the court is binding on all parties who had notice and is *res judicata* for that period); see also *Coldwell Banker Havens, Inc. v. Renfro*, 288 Ill. App. 3d 442, 448, 679 N.E.2d 1299, 1303 (1997) (the law-of-the-case doctrine provides that once a question of law or fact is litigated and decided, that is the end of the matter, and the decision settles the question for all subsequent stages of a lawsuit).

■ As earlier discussed, in April 2001, the United States filed a final account, which provided, in pertinent part, that (1) Patsy had wrongfully sold collateral pledged to the United States and distributed

$89,666.49 in sale proceeds and accrued interest to third parties, including Cherry, in violation of state and federal law and without the United States' consent; and (2) Cherry wrongfully received $38,830.73 in attorney fees from the sale proceeds and accrued interest. In late August 2001, the trial court adopted the United States' final account and directed the United States to prepare an order approving that account. The court also advised the parties that it would enter the proposed order if Patsy or Cherry did not file objections within 10 days of receiving the proposed order. In early September 2001, the United States filed the proposed order. The United States also sent copies of the proposed order to both Patsy and Cherry; however, neither Patsy nor Cherry filed an objection. Later in September 2001, the trial court entered a written order approving the final account and adopting the report and its attached exhibits as the court's factual findings. In that order, the court specifically found that $38,830.73 in attorney fees paid by Patsy to Cherry with the secured moneys of the United States and accrued interest thereon were disallowed. That same day, the trial court directed the circuit clerk to enter a docket entry order closing Floyd's estate and striking the cause, which the clerk later did. As earlier noted, the United States appealed, arguing that this court should vacate the docket entry. Cherry conceded that the docket entry should be vacated; however, he did not challenge the court's September 2001 order approving the April 2001 final account.

Thus, Cherry cannot now challenge the April 2001 final account or the trial court's September 2001 order approving that account. Accordingly, he cannot now challenge the court's determination that $38,830.73 in attorney fees was disallowed.

Our conclusion that Cherry cannot challenge on appeal the trial court's disallowance of the attorney fees does not end our analysis. Rather, the question is what the effect of the disallowance of those fees has.

The United States contends that the trial court should have ordered Cherry to repay $38,830.73 in previously disallowed attorney fees directly to the United States, as the secured creditor. Alternatively, the United States contends that the court should have ordered Cherry to return the disallowed attorney fees to Patsy, as the executrix of Floyd's estate.

In *Funk III*, slip order at 16-17, we declined the United States' request that we order Cherry to return the $38,830.73 to the United States. In so doing, we noted, in part, that the United States had not cited (nor had our research revealed) any Illinois decision holding that an attorney who wrongfully received legal fees from an executor should be required to return those fees to a secured creditor of the estate (as

opposed to the executor). The United States still has not cited (nor has our additional research revealed) any Illinois decision so holding.

From February 1983 through mid March 2001, Cherry was the attorney for Patsy in her capacity as executrix of Floyd's estate. Thus, his attorney fees were subject to the trial court's scrutiny and approval or disapproval. See 755 ILCS 5/27—2 (West 2002); see also *In re Estate of Devoy*, 231 Ill. App. 3d 883, 888, 596 N.E.2d 1339, 1343 (1992) (attorney fees in probate proceedings are subject to the trial court's approval and discretion; reversing the trial court's approval of additional attorney fees).

Once a trial court in a probate proceeding has disapproved or disallowed attorney fees, it may order that the attorney return the fees to the estate. *In re Estate of Minsky*, 59 Ill. App. 3d 974, 977-78, 376 N.E.2d 647, 649-50 (1978). In that case, the former executor of the decedent's estate filed his final account, which listed certain disbursements, including a $3,000 attorney fee. The current executrix filed objections to the final account, and following extensive hearings, the trial court determined, in pertinent part, that the $3,000 attorney fee should be returned to the estate because it had not been authorized by the court. The court's order also denied a separate petition for attorney fees that was filed by the former executor. *Minsky*, 59 Ill. App. 3d at 976-77, 376 N.E.2d at 649. On appeal, the appellate court affirmed the trial court's order denying attorney fees. *Minsky*, 59 Ill. App. 3d at 979-80, 376 N.E.2d at 651. That is not the process that was followed here where interim accounts, including attorney fees, were approved on an ongoing basis.

The United States at no time disputed—and in fact stipulated— that Cherry's attorney fees were reasonable, appropriate, and earned by him. This position completely distinguishes the cases cited by the United States. In *Minsky*, 59 Ill. App. 3d at 979-80, 376 N.E.2d at 651, attorney fees were disallowed because they either were not earned or constituted some sort of overreaching. In the present case, by contrast, it would appear that the fees at issue were previously approved by the trial court as they were paid, by the approval of interim reports and accounts, and all parties have stipulated the subject fees were both earned and reasonable.

The only proper interpretation of the trial court's order that these fees were disallowed, an order entered in response to this court's previous decision in *Funk II*, is that payment of the fees *by the executrix* from funds secured by the government's lien was disallowed. This conclusion is buttressed by the United States' initial petition, which alleged the *executrix* violated her fiduciary duty by paying Cherry, among others.

Of greater import, neither the trial court on remand nor this court has jurisdiction to order the entry of a judgment against Cherry for the return of the attorney fees paid to him. At all times in this proceeding until March of 2001, Cherry served as the attorney for the executrix of the estate. That he performed various tasks, such as writing checks on behalf of the administrator, does not make him a party. That his fees were approved on the executrix's motion and paid by her direction does not make him a party. Nor does the trial court order that Cherry remain in the case as an interested party create jurisdiction over him for this purpose. His status in this case was as a creditor. For any judgment against him to be valid, the court must have acquired personal jurisdiction over him by either a general appearance as a party or by service of process. *State Bank of Lake Zurich v. Thill*, 113 Ill. 2d 294, 308, 497 N.E.2d 1156, 1161 (1986). This lack of jurisdiction is a flaw that continues throughout the proceeding and even on appeal to this court. See *In re Marriage of Hostetler*, 124 Ill. App. 3d 31, 34, 463 N.E.2d 955, 957 (1984).

A review of the system created by the Probate Act of 1975 for the classification and payment of claims (755 ILCS 5/18—10 (West 2002)) makes it clear that attorney fees are an administrative expense entitled to preference in payment above all other non-Class I claims. It is also true that if an estate asset is burdened by a security interest, it does not become a part of the estate's assets until the security interest is discharged. *Estate of Yealick*, 69 Ill. App. 3d at 355, 387 N.E.2d at 400-01; *Estate of Philp*, 114 Ill. App. 3d at 111, 448 N.E.2d at 537. However, the liability for expending funds burdened by the security interest is the executor's. *In re Estate of Nonnast*, 300 Ill. App. 537, 557, 21 N.E.2d 796, 806 (1939). See *People ex rel. Schuchert v. Phelps*, 78 Ill. 147, 149-50 (1875) (payment in full by administratix of certain claims to the detriment of other claimants in the same class held not to relieve administrative liability for payment of sums due other claimants on a *pro rata* basis).

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment denying the prayer of the United States for relief against Cherry and the rendition of judgment against the executrix.

Affirmed.

MYERSCOUGH, J., concurs.

JUSTICE STEIGMANN, dissenting:

Because I believe that the trial court could have (and should have) ordered Cherry to return the $38,830.73 to Patsy, as executrix of Floyd's estate, I respectfully dissent.

From February 1983 through mid March 2001, Cherry was the attorney for Patsy in her capacity as executrix of Floyd's estate. Thus, his attorney fees were subject to the trial court's scrutiny and approval or disapproval. See 755 ILCS 5/27—2 (West 2002); see also *Devoy*, 231 Ill. App. 3d at 888, 596 N.E.2d at 1343 (attorney fees in probate proceedings are subject to the trial court's approval and discretion; reversing the trial court's approval of additional attorney fees).

As the majority recognizes, once a trial court in a probate proceeding has disapproved or disallowed attorney fees, it may order that the attorney return the fees to the estate. See *Minsky*, 59 Ill. App. 3d at 977-78, 376 N.E.2d at 649-50; see also *People ex rel. Chicago Bar Ass'n v. Templeman*, 363 Ill. 152, 157, 1 N.E.2d 850, 852-53 (1936) (in which the supreme court, in the context of an attorney-disciplinary proceeding, recognized the trial court's authority to enter an order to return disallowed attorney fees and held that "[d]efiance, by an attorney representing the executor or administrator, of orders of the probate court to turn over money in his hands to an administrator appointed by [the court], constitutes a flagrant violation of his duty sufficient to warrant his disbarment").

In addition, by virtue of the trial court's May 2001 order that Cherry remain as an interested party in the proceedings, the court had plenary jurisdiction over him as to the ultimate disposition of the disallowed attorney fees. See 755 ILCS 5/1—2.11 (West 2002) (an "interested person" under the Act "means one who has or represents a financial interest, property right[,] or fiduciary status at the time of reference which may be affected by the action, power[,] or proceeding involved"); see also *In re Estate of Miller*, 334 Ill. App. 3d 692, 703, 778 N.E.2d 262, 271 (2002) (in which the appellate court concluded that the trial court had jurisdiction to award a judgment in favor of a joint tenant in certificates of deposit with the testator, even though the joint tenant was not a named party and did not participate in the citation proceedings; reasoning that the joint tenant was an "interested party," who had a financial interest in the citation). In this case, Cherry clearly had a financial interest in the proceedings and actively participated in the hearings as to the United States' final account.

Thus, the trial court here had the authority—once it determined that the $38,830.73 in attorney fees was disallowed—to order that Cherry return the fees to Patsy, who then would turn over the secured moneys to the United States. Under the circumstances of this case,

the court should have done just that. In that regard, I note that the record shows that in April 1989, Cherry (at Patsy's request) opened a separate account on the estate's behalf, over which he had exclusive control. From April 1989 until March 2001, Patsy had no access to estate funds and no control over how the funds were spent. According to Patsy, Cherry decided what bills would be paid and what checks would be written from the account. Cherry knew that the account contained money from the sale of collateral pledged to the United States and accrued interest thereon. Nonetheless, without prior court approval or the United States' consent, Cherry received $38,830.73 in attorney fees from money that belonged to the United States as a secured creditor. Accordingly, I believe that the court erred by denying the United States' request that the court order Cherry to return the disallowed attorney fees to Patsy as executrix.